[Civ. No. 1424.    Third Appellate District.—January 10, 1916.]

## GRENFELL LUMBER COMPANY (a Corporation), Respondent, v. JAMES F. PECK, Appellant.

MECHANIC'S LIEN—ACTION FOR FORECLOSURE—PURCHASE BY AGENT OF DEFENDANT—SUFFICIENCY OF EVIDENCE.—In this action for the foreclosure of a lien for materials furnished by the plaintiff for use in the construction of a barn on real property owned by the defendant, the court was warranted in finding that the son of the defendant, in the transaction with the plaintiff, was acting for and as the agent, either actual or ostensible, of the defendant.

APPEAL from a judgment of the Superior Court of Colusa County. H. M. Albery, Judge.

The facts are stated in the opinion of the court.

Henry C. McPike, Ernest Weyand, and Frank R. Wehe, for Appellant.

Thomas Rutledge, and Alva A. King, for Respondent.

HART, J.—The court below rendered and caused to be entered judgment foreclosing a materialman's lien on the real property described in the complaint for the sum of

$445.05 for materials furnished by the plaintiff for use in the construction of a barn on said real property, which property was owned by the defendant.

This appeal is by the defendant from said judgment and is supported by a bill of exceptions.

The general point urged against the judgment is that the findings upon which it is predicated are not supported by the evidence.

The theory upon which the plaintiff originally drafted its complaint was that it was entitled to the benefit of the lien provided for by section 1183 of the Code of Civil Procedure, which, among other things, provides that mechanics, materialmen, etc., and all persons and laborers of every class performing labor upon or furnishing materials to be used in the construction, alteration, addition to or repair, either in whole or in part, of any building, wharf, bridge, etc., shall have a lien upon the property upon which they have bestowed labor or furnished materials, for the value of such labor done or materials furnished, whether at the instance of the owner, or of any other person acting by his authority or under him, as a contractor or otherwise. Upon the day set for the trial of the cause, and upon the opening thereof, counsel for the plaintiff asked and was granted leave by the court to amend the complaint by adding thereto the following: "That said defendant, James F. Peck, had and obtained knowledge of the construction of said barn on said premises at the time the construction of the same was commenced." This amendment is based upon section 1192 of the Code of Civil Procedure, which provides that where there is constructed any of the buildings mentioned in section 1183, *supra*, upon any lands with the knowledge of the owner of such lands, or of the person having or claiming any interest therein, such building shall be held to have been constructed and the labor performed thereon and the materials used therein furnished at the instance of such owner or person having or claiming any interest therein, "and the interest owned or claimed shall be subject to any lien filed in accordance with the provisions of this chapter, unless such owner or person having or claiming any interest therein shall, within ten days after he shall obtain knowledge of the construction, alteration, repair, or work or labor, give notice that he will not be responsible for the same, by post-

ing a notice in writing to that effect, in some conspicuous place upon the said land . . . or upon the building or other improvements situated thereon. . . . ''

The point is made that by the amendment thus allowed a new cause of action was stated and that said new cause is barred by the terms of section 1190 of the Code of Civil Procedure. But, whether this be true or not—whether, in other words, a resort to or the pleading of another and different lien from that originally relied upon would amount, strictly speaking, to the introduction of a *new* cause of action, where the ultimate object of the action in either case is precisely the same or for precisely the same relief as to the same transaction, it is certainly true that the provisions of said section 1190 affect the remedial rights of lien claimants. The point is an important one, but we do not feel compelled to consider and decide it here. There is no claim, nor can there be, that the cause of action stated in the complaint as it was originally drafted and filed was changed by the amendment. The complaint, therefore, states a cause of action for the lien authorized by section 1183 of the Code of Civil Procedure, and we have been persuaded, after a careful examination of the record, that the judgment is supported by the findings as to the lien authorized by said section. And, in the outset, we may further say that we are of the opinion that the findings so referred to derive sufficient support from the proofs.

The court, among other facts, found that ''between the thirty-first day of October, 1911, and the twelfth day of January, 1912, inclusive, the plaintiff furnished to the defendant, on the order of C. M. Peck, and at his special instance and request, and said C. M. Peck bought all that certain lumber, all for the use and benefit of said defendant, of the total value of $445.05, as hereinafter set out. That the said C. M. Peck was then and there and for a long time prior thereto, the duly authorized and acting agent of said defendant, and said lumber was so bought and ordered by said C. M. Peck, acting for and as the agent for and in behalf of said defendant, James F. Peck, . . . and that said lumber was so furnished by said plaintiff to defendant to be used, and the same was actually used by him in the erection of a structure, to wit, a barn upon a certain tract of land, then and now owned by him,'' describing said land.

These facts were admitted at the trial: That C. M. Peck, a son of the defendant, in the year 1909, purchased the land described in the complaint and upon which the barn in question was erected; that, although the money paid by C. M. Peck for the land was furnished by the defendant, who resided in the city of San Francisco, the former took the title deed in his own name; that the defendant was the real owner of the land and C. M. Peck held title thereto as trustee for the benefit of the defendant; that C. M. Peck, after purchasing the land, managed and personally controlled it and all the business connected therewith; that C. M. Peck left Colusa in the month of November, 1910, and in the month of August, 1911, went to Lexington, Virginia, to attend a law school; that one M. V. Santos became a tenant of the land by virtue of the terms of a certain lease, and that thereafter and on the tenth day of February, 1910, C. M. Peck conveyed the premises to the defendant by deed duly recorded in the office of the county recorder of Colusa County on the date of its execution. It was further admitted that C. M. Peck had, previously to the transaction from which this controversy arises, purchased lumber from the plaintiff and paid for the same by means of a draft drawn by him upon the defendant. It was also admitted that all the lumber or materials furnished for the ranch or land described in the complaint while the same was standing in the name of C. M. Peck, and subsequently, was paid for by the defendant; that the lumber or material referred to in the complaint and described in the lien filed by the plaintiff was actually used in the erection of the barn on the land described in the complaint.

As to the controverted facts, Le Roy Grenfell, secretary of the plaintiff corporation, testified: "Between the year 1909 and the selling of the lumber referred to in the complaint, C. M. Peck had come to the yard and brought parties with him, and gave me verbal orders, and also to men in the yard. I had an oral order at all times. One bill was sent to C. M. Peck in the east, and he sent me a draft on defendant. . . . I know Santos. He has been residing on this land. Mr. C. M. Peck brought Santos into the office and instructed me to deliver lumber to Santos for the ranch at any time he should call for it. The first bill was paid for—the last has not yet been paid for. The first bill was paid by a draft

on the defendant. In connection with this last bill, I delivered the lumber referred to in the complaint to Mr. Santos. The lumber was delivered on the orders, as in all previous cases, orders received from C. M. Peck. All lumber ordered by Mr. Santos was delivered to Mr. Santos on C. M. Peck's orders. Mr. C. M. Peck visited the office and left these orders there—to deliver to Mr. Santos at any time that he called for lumber, and charge it to the ranch account. That was the final orders. . . . During this time Mr. Santos was in possession of the premises as tenant. Santos was present with C. M. Peck when directions were given to deliver the lumber to Santos. . . . Mr. Peck did not say anything as to how this lumber would be paid for, or who would pay for it. I presumed it would be treated as previous bills. . . . All bills were charged to 'C. M. Peck, ranch account.' C. M. Peck had some other accounts there, but this particular lumber was to be charged to the ranch account. At that time I had learned and knew of the transfer of the ranch from C. M. Peck to the defendant. Had no conversation with C. M. Peck in regard to that matter. There was a bill paid by James F. Peck after the ranch was transferred. Mr. C. M. Peck was personally in charge of the ranch at that time (the time the orders above mentioned were given). I had very little to do with James F. Peck. I met him once. . . . At the time these orders were given, C. M. Peck was residing in Colusa, but this lumber was not furnished until after C. M. Peck had left here for the east, but it was furnished upon the order that he had given before he left for the east. Q. Now, was there any change in the control or management of the ranch that you know of, actually, subsequent to the time C. M. Peck made his deed to James F. Peck? A. There was not. When Santos came for the lumber, he stated that it was to build a barn on the ranch. He visited the office, gave me the size of the barn, and wanted to know what it would cost. I figured it up for him, and gave him the figures; also wrote a letter to defendant, which Santos signed, and Santos received the answer. I did not.'' The letter written by the witness and addressed to the defendant at San Francisco read as follows: ''Mr. Santos wishes to explain the following regarding a barn on the ranch.'' Here follows a description of the barn proposed to be erected— the dimensions, kind of roof, and cost of the material neces-

sary to its construction. The letter then continued: "He would like to hear from you by early mail if you will allow him the barn, as he has considerable hay out and would like to commence building the barn at once, to get the hay in before it rains." (Here it may parenthetically be explained that it was shown by the testimony of Santos that the defendant, in reply to a letter previously written by the former to the latter, addressed the following letter to Santos, the same being dated at San Francisco, September 25, 1911, and to which the letter above quoted was an answer: "Yours of the 23d received. Before my son went east he said something about building a barn. I think he said he was to purchase the material and you were to build the barn. Please write me what the material would cost, and I will see what can be done. If you write as soon as you receive this, I will get it next Saturday.")

The witness, Grenfell, continuing, testified: "After I had written this letter [the one first above quoted] Santos came to the lumber company and got the lumber for this barn."

A. H. Walworth, yard manager or foreman of the plaintiff when the transactions involved here were had, testified: "I remember that C. M. Peck and Santos were in the yard of the lumber company when they discussed the question of furnishing lumber to M. V. Santos. Santos drove up there after some lumber and while Mr. Grenfell came out with the order to me, Mr. Peck came along and said: 'Let Mr. Santos have anything he wants and charge it to the ranch.' That was in 1911 or 1910, I don't just remember. Santos got lumber to put up a barn out there. Prior to that time a great many posts and fence lumber of various kinds. I remember the circumstance of Santos coming to the lumber-yard for lumber for the barn. When he first started Santos hauled out a few loads and then Mr. Green hauled out the bulk, and a while afterward Mr. Santos came back and hauled several more loads."

Santos, testifying for the plaintiff, said that Mr. C. M. Peck told Mr. Grenfell, "Let him have the posts and lumber for the place." He further said that Mr. C. M. Peck did not "say anything to Mr. Grenfell about getting any other lumber." It appears that Santos received a letter from C. M. Peck, dated at Lexington, Virginia, October 24, 1911, which read as follows: "In regard to the lumber, I wish to state

that I have bought it, and also all the iron that is in the little shed in front of the house where the lumber is. Now, I want you to haul it at once, and get it all down there on the ranch, or the mound before the high water comes. Don't neglect this at all. You can then build the barn as we agreed. I will furnish the nails for the same. Now, don't put this off one day, but get at it, and get the barn up before the winter sets in. I shall insist that you attend to this feature at once, as it is getting late.'' Here it should be explained that the lumber and iron which C. M. Peck, in the foregoing letter spoke of having bought, were from an old warehouse, which had stood on other land of which said Peck had once been in control for a corporation, and which had been destroyed for practical uses by the force of winter storms and floods.

Santos, continuing his testimony, said: ''I remember the building of a barn down there. I got the lumber just spoken of [posts, etc.] quite a little while before the barn was built. I never came after any more lumber but at the time I got the letter [above quoted] from C. M. Peck to build this barn. I had some conversation with Mr. C. M. Peck before he went back east about building this barn on this place. He told me he was going down to the city and see that C. C. I. Company and see about that lumber on that knoll [the lumber from the old warehouse above mentioned]. I never heard anything about it for some time, but later in the fall Mr. Peck wrote me a letter [the one last above quoted herein] from Virginia. . . . I showed it [the last mentioned letter] to Mr. Grenfell, and I told him to write to Mr. Peck [the defendant]. . . . We wrote to Mr. Peck [defendant] about the cost of the building, you see, and then after that I waited, I guess about a week, or more than a week, for the letter. And the time the letter came back I took it to Mr. Grenfell, and he told me I can have the lumber. . . . All the dealings I had in regard to the ranch was with Mr. C. M. Peck—young Mr. Peck.''

The above synopsis of the testimony presented by the plaintiff is sufficient to show that the court was warranted in finding that C. M. Peck, in the transaction with the plaintiff, was acting for and as the agent, either actual or ostensible, of the defendant. To recapitulate: C. M. Peck had been in personal charge of the ranch and had during that time bought lumber from the plaintiff and had the same charged to ''the

ranch account." After his departure for the east, having received a bill from the plaintiff for lumber used on the ranch, he drew a draft on the defendant for the payment of the bill and sent the same to plaintiff, and it was subsequently honored by payment by the defendant. C. M. Peck, as seen, wrote to Santos from Lexington, Virginia, directing him to proceed at once to the erection of the barn. The defendant's letters, inquiring of Santos as to the arrangements between the latter and C. M. Peck with regard to the building of a barn on the ranch, in effect recognized the authority of C. M. Peck to act for the defendant in the matter of the construction of said barn.

As to the arrangement for the procuring of the material from which the barn was to be constructed, the positive testimony of the secretary of the plaintiff, corroborated by Walworth, the plaintiff's yard foreman, is to the effect that C. M. Peck brought Santos to the office and the lumber-yard of the company and unqualifiedly instructed them to let Santos have such lumber as he might find necessary to be used upon the ranch, and that (so Grenfell testified) it was upon the instructions so given by C. M. Peck that Santos was furnished with the lumber with which the barn was built. This testimony, we repeat, is sufficient to support the finding that C. M. Peck, if not actually authorized by the defendant to act for him in the matter of the building of the barn and in directing the plaintiff to deliver to Santos the lumber necessary therefor, was, notwithstanding, ostensibly the agent of the defendant, or by the latter's acts and conduct had been sufficiently held out to be his agent in the business concerned here to warrant the plaintiff in so regarding him and dealing with him accordingly (*Robinson* v. *American Fish etc. Co.,* 17 Cal. App. 212, 219, [119 Pac. 388], and authorities therein referred to), and the further finding that C. M. Peck gave general instructions to the plaintiff to let Santos have such lumber for use on the ranch as he might require.

There is, it is true, a direct conflict in the evidence upon the vital facts of the controversy. C. M. Peck positively testified that the only directions he ever gave the plaintiff with regard to the delivery of lumber to Santos had relation to certain posts and other material to be used in the erection or repair of a fence upon the land in question. As to the barn, he testified that he gave Santos specific orders to construct

the same entirely from the old lumber obtained from the
wrecked warehouse purchased by him before he left for the
east.   His letter to Santos from the state of Virginia would
indicate that he intended that the old lumber referred to was
to be used in the construction of the barn.   It is also true
that the letters from the defendant would indicate that
whether the building of the barn should be proceeded with
was to depend upon the consent of the defendant thereto to
be given Santos.   But all this testimony is, as stated, only in
contradiction of that produced by the plaintiff to the effect
that C. M. Peck directed it to let Santos have whatever lum-
ber he might require for the purposes of the ranch, the result
of which was, obviously, to raise a substantial conflict, and
the effect thereof solely a matter for determination by the
trial court.

Assuming, as is the contention, that it was true that the in-
tention of both C. M. Peck and the defendant was that the
barn should be built from the lumber obtained from the ware-
house, nevertheless, these facts remain, having been found
upon sufficient evidence by the court: That both C. M. Peck
and the defendant desired that a barn be erected upon the
ranch; that Santos had been instructed to build it; that there
is testimony that C. M. Peck, having the authority to do so,
gave instructions, unhampered by restrictions, conditions, or
qualifications of any kind or character, to the plaintiff to let
Santos have whatever lumber he needed on the ranch, and to
charge the same to the ranch account; that, acting under such
instructions, the lumber company did let Santos have the lum-
ber necessary for the construction of the barn, and that the
lumber so furnished Santos was actually used in the erection
of the barn upon said ranch.   Under these circumstances, we
fail to perceive how it could change or affect the legal effect
of the transaction or remove the legal obligation of the de-
fendant to pay for the materials so obtained by Santos even
if it be true that Santos did not use, in the construction of
the building, the particular lumber it was the wish and the
intention of C. M. Peck or of the defendant that he should
have used for that purpose.   Santos might have acted in bad
faith with the defendant and the latter's agent, C. M. Peck,
by failing to obey the directions of his superior to use the
materials specified by the latter in the construction of the
barn.   This fact, however, constitutes no reason for holding

that the plaintiff has no basis for a just and legal claim for materials furnished Santos by express directions of the owner of the land, for which they were to be used, or, as the court found upon sufficient evidence, under directions of an agent of the owner.

Our conclusion is, as before declared, that the judgment in favor of the plaintiff upon the theory upon which we have here considered it is supported by the facts as found and the conclusions of law following therefrom.

The judgment is therefore affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on February 9, 1916, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 9, 1916.